**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

PETER NICOLETTI,

     Plaintiff,

v.                                   Case No. 1:21-cv-01454

JONES LANG LASALLE AMERICAS,       Hon. John Z. Lee
INC.                            Hon. Magistrate Jeffrey Cole

     Defendant.

_____/

## AMENDED COMPLAINT

Plaintiff, Peter Nicoletti, by and through his attorneys, KONICEK & DILLON, P.C., and

sues Defendant, Jones Lang LaSalle Americas, Inc. ("JLL"), and allege as follows:

### Jurisdiction, Parties, and Venue

1.     Peter Nicoletti is a natural person who is a resident of the State of Florida and, for

purposes of diversity jurisdiction, a citizen of Florida.

2.     Jones Lang LaSalle Americas, Inc. is a Maryland corporation with its principal

place of business in Chicago, Illinois.

3.     This Court has subject matter jurisdiction under 28 U.S.C § 1332 (diversity of

citizenship) because Mr. Nicoletti and JLL are citizens of different states and the sum or value of

the matter in controversy exceeds $75,000, exclusive of interest and costs.

4.     This Court has personal jurisdiction over JLL because it transacts business and its

principal place of business is in the State of Illinois and in this District.

5.     Venue is proper under 28 U.S.C. § 1391(b)(1) because JLL's principal place of

business is in this District.

### Administrative Proceedings

6.     Mr. Nicoletti dually-filed a Charge of Discrimination with both the New York

State Division of Human Rights and the Equal Employment Opportunity Commission ("EEOC") alleging that JLL violated the Americans with Disabilities Act ("ADA").

7.      On June 24, 2021, the EEOC issued a Notice of Right to Sue Letter. A copy of the Notice of Right to Sue Letter is attached as Exhibit A.

8.      All other conditions precedent to the bringing of this action have occurred, been performed or been waived.

### General Allegations

9.      This action seeks damages for JLL's retaliation in violation of the ADA, Family and Medical Leave Act ("FMLA"), breach of its contractual obligations to Mr. Nicoletti, unjust enrichment, and unpaid wages.

10.      On January 22, 2008, Mr. Nicoletti entered into an employment agreement with JLL. A copy of the employment agreement is attached as Exhibit B.

11.      While employed by JLL, Mr. Nicoletti was an employee as defined by common law.

12.      The work Mr. Nicoletti performed for JLL was directly essential to JLL's business.

13.      JLL was and is an employer as defined by the FMLA and common law.

14.      JLL was and is an enterprise engaged in commerce as defined by the common law.

15.      JLL's employment agreement with Mr. Nicoletti expressly incorporated JLL's Code of Business Ethics. *See* Exhibit B, p.4. A copy of JLL's Code of Business Ethics is attached as Exhibit C.

16. Under the JLL Code of Ethics, JLL, among many other things, promised that it would not discriminate against Mr. Nicoletti on the basis of his disability, stated that it does "not tolerate retaliation", and that it takes "claims of retaliation very seriously." *See* Exhibit C at 15.

17. In March of 2020, JLL requested Mr. Nicoletti to enter into a U.S. Capital Markets Producer Compensation Plan ("the Plan"). A copy of the Plan is attached as Exhibit D.

18. After Mr. Nicoletti expressed hesitation concerning the terms of the Plan, JLL ultimately forced Mr. Nicoletti to sign the Plan on March 26, 2020.

### A. Mr. Nicoletti remained an excellent performer despite his cancer diagnosis.

19. Mr. Nicoletti is an accomplished commercial real estate broker.

20. At JLL, Mr. Nicoletti was very successful, generating millions of dollars of brokerage fees for JLL each year.

21. On November 13, 2017, Mr. Nicoletti was diagnosed with Acute Myeloid Leukemia ("AML").

22. Around this same time, Mr. Nicoletti notified JLL's Head of Capital Markets Jay Koster, President of Capital Markets John Geanokos, Mr. Nicoletti's direct supervisor Blake Lacher, and other employees of his condition.

23. CEO of the Americas Greg O'Brian was similarly aware of Mr. Nicoletti's condition. In fact, Mr. O'Brian recommended an AML specialist to Mr. Nicoletti.

24. As a result of Mr. Nicoletti's diagnosis, he underwent 26 days of chemotherapy, during which he was hospitalized. Following his exit from the hospital, Mr. Nicoletti continued to receive chemotherapy treatments on a monthly basis — each time requiring an in-hospital stay of five (5) days.

25.     Despite his ongoing treatment, Mr. Nicoletti continued to perform his job duties from home and, on occasion, from JLL's office when possible despite being on FMLA leave. In fact, on one particular occasion, Mr. Nicoletti chartered a private jet to Houston, Texas in order to pitch a deal to a potential client.

26.     Mr. Nicoletti ultimately closed the year of 2017 as one of the top producers in all JLL Capital Markets.

27.     On March 1, 2018, Mr. Nicoletti received a stem cell transplant. Following the transplant, Mr. Nicoletti was required to quarantine at home until June.

28.     During those months, Mr. Nicoletti continued to actively perform his job duties — actively working on transactions and coordinating with his team.

29.     In June of 2018, Mr. Nicoletti began to transition back into the workplace on a part-time basis. Initially, Mr. Nicoletti worked in the office one-to-two days a week, but eventually returned to the office on a full-time basis by September of 2018.

30.     Mr. Nicoletti's performance continued to be excellent. In fact, Mr. Nicoletti closed 2018 in the top 10% of all Capital Markets producers.

**B.  *Despite Mr. Nicoletti's continued positive performance, JLL began singling him out.***

31.     Prior to his AML diagnosis, Mr. Nicoletti had been in the process of finalizing a new employment agreement with JLL. Specifically, Mr. Koster had informed Mr. Nicoletti that the new deal would be finalized by the end of November 2017. However, following Mr. Nicoletti's diagnosis and during his hospitalizations, Mr. Nicoletti never received any additional information from Mr. Koster.

32. In November of 2018, Mr. Nicoletti was called into a meeting with Mr. Koster, Mr. Geanokos, and Mr. Lacher, in which Mr. Nicoletti was informed that he would not be provided with the new employment agreement.

33. Mr. Nicoletti was told that the purported reason for this change in plans was the fact that he was allegedly "being difficult" with commission split negotiations.

34. In response, Mr. Nicoletti noted that JLL had just recently completed a new deal with another employee that was notorious for negotiating internal fee splits. However, Mr. Nicoletti was simply told, "it is what it is".

### C. Mr. Nicoletti suffered from additional health issues.

35. In February of 2019, Mr. Nicoletti contracted parainfluenza and was hospitalized for six (6) days in the Intensive Care Unit with pneumonia. Mr. Nicoletti also suffered from additional complications, which included liver and kidney failure, as well as a heart attack. Mr. Nicoletti also suffered from a blood clot in his leg when he left the hospital and was effectively bed ridden for three (3) weeks afterward.

36. Despite these ongoing health concerns, Mr. Nicoletti notified Mr. Koster, Mr. Geanokos, and Mr. Lacher at the time of each hospitalization and the impossibility of travel following Mr. Nicoletti's blood clot.

37. Despite this, Mr. Nicoletti continued to be actively involved in all his deals during this time.

38. Following his recovery, Mr. Nicoletti again returned to the office in April of 2019 on a full-time basis.

### D. Mr. Nicoletti is purposefully targeted during JLL's ongoing merger.

39. On March 19, 2019, JLL announced a merger with HFF, Inc.

40.     On July 1, 2019, the JLL acquisition of HFF officially closed.

41.     On August 2, 2019, Mr. Nicoletti reached out directly to the new President of Capital Markets, Jodi Thorton, and CEO and Head of Capital Markets, Mark Gibson, in an effort to discuss his role in the new structure.

42.     On August 15, 2019, Mr. Nicoletti met with Mr. Gibson in Dallas, Texas. During this meeting, Mr. Gibson informed me that he had "done his research on Mr. Nicoletti," and that he had heard that Mr. Nicoletti "was difficult to deal with" and "not a team player." Mr. Gibson also explained that he had also heard Mr. Nicoletti was a new person and that he would need to "work" with others if he wanted to "make it work."

43.     Mr. Gibson's allegations left Mr. Nicoletti incredulous. In response, Mr. Nicoletti explained that he had created three of the most success business lines within JLL's Capital Markets groups and, most importantly, had done so by implementing and following a team structure.

44.     Mr. Gibson ended the meeting by telling Mr. Nicoletti to meet with the head of the New York City office, Mike Tepedino, to discuss the team and their ongoing role.

45.     On September 3, 2019, Mr. Nicoletti met with Mr. Tepedino. During this meeting, Mr. Nicoletti and Mr. Tepedino reviewed Mr. Nicoletti's history with JLL and discussed a business plan for moving forward.

46.     More than two months later, on November 19, 2019, Mr. Nicoletti was informed by Mr. Tepedino that JLL was going to disband Mr. Nicoletti's team and that his job role would be changed to bring in business and utilize the "platform" to execute deals. Mr. Nicoletti was also told that his fellow team members would be allowed to find roles in other groups, but that Mr. Nicoletti himself would not be allowed to have his own team to execute deals.

**E.  JLL's conduct continued following the implementation of its new structure.**

47.     Following this change in structure, JLL repeatedly and unnecessarily changed Mr. Nicoletti's work location over the period spanning from October of 2019 to February of 2020.

48.     For example, in October of 2019, Mr. Nicoletti was moved from JLL's New York headquarters to an old HFF office.

49.     Just two months later, in December of 2019, JLL moved Mr. Nicoletti *back* to JLL's headquarters.

50.     Another two months later, in February of 2020, JLL again moved Mr. Nicoletti— this time across the office and without any notification.

51.     During this same time period, Mr. Nicoletti was repeatedly excluded from group and product type calls and meetings. Mr. Nicoletti was also repeatedly excluded from requests-for-proposals, client meetings, and various other opportunities.

52.     In January of 2020, Mr. Nicoletti's executive assistant was re-assigned without his knowledge to another group, leaving Mr. Nicoletti without any administrative support.

53.     Eventually, after raising concerns with this conduct, Mr. Nicoletti was added to a list of nine (9) other individuals to whom his executive assistant was assigned. This unilateral reassignment left Mr. Nicoletti with extremely limited support and severely affected his ability to perform his job.

54.     Unfortunately for JLL, their efforts to force Mr. Nicoletti's resignation were unfruitful.

**F.  When JLL's efforts to get Mr. Nicoletti to quit failed, the company conjured up a pretextual reason to terminate him.**

55. On May 8, 2020, Mr. Nicoletti received an email and calendar invite for a "mandatory" call. On this call were Andrew Scandalios, Mr. Nicoletti's direct report in New York City, and Melony Jones, a Human Resources representative.

56. During this call, Mr. Scandalios informed Mr. Nicoletti that he was terminated.

57. When Mr. Nicoletti inquired as to the reasoning for his dismissal, Mr. Scandalios failed to provide an answer.

58. However, after Mr. Nicoletti continued to press, Mr. Scandalios offered the reason for Mr. Nicoletti's immediate and sudden termination. Mr. Scandalios amazingly stated that Mr. Nicoletti had "not attended Monday morning meetings."

59. In response, Mr. Nicoletti explained to Mr. Scandalios that he had never been invited to such a meeting until after the New York Capital Markets Strategic Planning Off-site for Producers, which was held on January 9, 2020.

60. Mr. Scandalios simply responded that Mr. Nicoletti's statement was "not true."

61. Mr. Scandalios then changed his reasoning for the termination, instead claiming that Mr. Nicoletti's production was "low" in 2019.

62. Of course, this was similarly untrue. In fact, Mr. Nicoletti noted that his performance had remained positive despite his ongoing health issues during the year.

63. Making clear the pretext for his termination, Ms. Jones stated that JLL was "unaware of any ongoing health issues" with which Mr. Nicoletti suffered.

64. During this meeting, Mr. Nicoletti also inquired as to how he would be able to continue his healthcare coverage as a result of his termination.

65. Ms. Jones stated that she would call Mr. Nicoletti later that same afternoon to discuss further.

66.     However, Mr. Nicoletti never received any follow-up from Ms. Jones or anyone other individual at JLL.

67.     Notably, Mr. Nicoletti's next communication from JLL was an email from Ms. Jones on May 15, 2020 stating that JLL had been unsuccessful in reaching Mr. Nicoletti via phone, despite the fact that Mr. Nicoletti never received a call from anyone at JLL with regard to his termination process.

68.     Under the express terms of the Plan, Mr. Nicoletti was entitled to receive all earned but unpaid commission payments for transactions that close during the term of his employment. *See* Exhibit D, p. 5.

69.     To date, JLL has refused to pay Mr. Nicoletti any commission payments.

70.     Mr. Nicoletti has engaged the undersigned law firm to represent him in this action and is obligated to pay a reasonable fee for its services.

71.     All conditions precedent to maintaining this action have occurred, been performed or have been waived.

**Count One**
**FMLA Retaliation**

72.     Mr. Nicoletti alleges and incorporates by reference the allegations in paragraphs 1 through 53.

73.     This is an action by Mr. Nicoletti against JLL for retaliation in violation of the FMLA.

74.     JLL retaliated against Mr. Nicoletti because of his exercise of his rights to leave under the FMLA.

75.     As a result of JLL's conduct, including its termination of Mr. Nicoletti's employment, Mr. Nicoletti has suffered actual damages, plus consequential and other damages

9

flowing from JLL's breaches in an amount to be determined at trial, plus attorneys' fees, costs, and interest.

76.     Pursuant to the FMLA, Mr. Nicoletti is entitled to an award of his attorneys' fees and expenses.

WHEREFORE, Mr. Nicoletti demands the Court to:

A.     Enter judgment in his favor;

B.     Award Mr. Nicoletti damages in an amount to be determined at trial that exceeds $75,000.00, which includes:

i.     actual damages;

ii.     compensatory damages; and

iii.     consequential damages;

C.     Award Mr. Nicoletti his attorneys' fees and costs under the FMLA;

D.     Award Mr. Nicoletti pre- and post-judgment interest; and

E.     Award Mr. Nicoletti all further relief the Court finds just and proper.

**Count Two**
**Breach of Contract**

77.     Mr. Nicoletti alleges and incorporates by reference the allegations in paragraphs 1 through 53.

78.     This is an action by Mr. Nicoletti against JLL for breach of contract.

79.     Mr. Nicoletti entered into a contract with JLL: the employment agreement attached as Exhibit B that incorporated JLL's Code of Business Ethics attached as Exhibit C.

80.     JLL materially breached the contract when it discriminated against Mr. Nicoletti and terminated him on the basis of his disability.

81.     JLL has also materially breached the contract by refusing to pay Mr. Nicoletti the commission payments it owes him under the employment agreement.

82.     JLL has also materially breached the Plan by refusing to pay Mr. Nicoletti the commission payments it owes him pursuant to it.

83.     As a result of JLL's breaches, Mr. Nicoletti has suffered actual damages, plus consequential and other damages flowing from JLL's breaches in an amount to be determined at trial, plus attorneys' fees, costs, and interest.

WHEREFORE, Mr. Nicoletti demands the Court to:

A.     Enter judgment in his favor;

B.     Award Mr. Nicoletti damages in an amount to be determined at trial that exceeds $75,000.00, which includes:

      i.     actual damages;

      ii.     compensatory damages; and

      iii.     consequential damages;

C.     Award Mr. Nicoletti pre- and post-judgment interest; and

D.     Award Mr. Nicoletti all further relief the Court finds just and proper.

**Count Three**
**Unjust Enrichment**

84.     Mr. Nicoletti alleges and incorporates by reference the allegations in paragraphs 1 through 53.

85.     This is an action by Mr. Nicoletti against JLL for unjust enrichment.

86.     Mr. Nicoletti conferred benefits upon JLL. From Mr. Nicoletti's services and successful commercial real estate brokerage business, JLL received benefits in the form of millions of dollars of brokerage fees.

87.     JLL voluntarily accepted and retained these benefits.

88.     Under the circumstances, it would be inequitable for JLL to retain these benefits without paying Mr. Nicoletti for them.

WHEREFORE, Mr. Nicoletti demands the Court to:

A.      Enter judgment in his favor;

B.      Award Mr. Nicoletti damages for the value of benefits he conferred to JLL in an amount that exceeds $75,000.00;

C.      Award Mr. Nicoletti costs;

D.      Award Mr. Nicoletti pre- and post-judgment interest; and

E.      Award Mr. Nicoletti all further relief the Court finds just and proper.

**Count Four**
**Common Law Unpaid Wages**

89.     Mr. Nicoletti alleges and incorporates by reference the allegations in paragraphs 1 through 53.

90.     This is an action by Mr. Nicoletti against JLL for unpaid wages under common law.

91.     Mr. Nicoletti worked for JLL, and JLL agreed to pay Mr. Nicoletti for his services.

92.     JLL has willfully failed and refused to pay Mr. Nicoletti for all wages it owes him.

93.     As a result of JLL's failure and refusal to pay Mr. Nicoletti, he has suffered damages.

WHEREFORE, Mr. Nicoletti demands the Court to:

A.      Enter judgment in his favor;

B.      Award Mr. Nicoletti damages for his unpaid wages in an amount to be determined at trial that exceeds $75,000.00;

C.      Award Mr. Nicoletti his costs;

D.      Award Mr. Nicoletti pre- and post-judgment interest; and

E.      Award Mr. Nicoletti all further relief the Court finds just and proper.

**Count Five**
**ADA Discrimination**

94.     Mr. Nicoletti alleges and incorporates by reference the allegations in paragraphs 1 through 53.

95.     Mr. Nicoletti is a member of a protected class under the ADA, as he suffered from a disability at all relevant times aforementioned.

96.     At all relevant times aforementioned, Mr. Nicoletti was a qualified individual with a disability within the meaning of the ADA as he was able to perform the essential functions of his job for JLL with or without reasonable accommodation.

97.     By the conduct described above, JLL discriminated against Mr. Nicoletti because of his disability.

98.     At all relevant times aforementioned, JLL was aware of Mr. Nicoletti's disability.

99.     As a result of JLL's unlawful conduct, Mr. Nicoletti has suffered damages.

WHEREFORE, Mr. Nicoletti demands the Court to:

A.      Enter judgment in his favor;

B.      Award Mr. Nicoletti damages in an amount to be determined at trial that exceeds $75,000.00, which includes:

i.      actual damages;

ii.     compensatory damages; and

        iii.    consequential damages;

C.    Award Mr. Nicoletti back pay and benefits;

D.    Award Mr. Nicoletti interest on his back pay and benefits;

E.    Award Mr. Nicoletti front pay and benefits;

F.    Award Mr. Nicoletti his attorneys' fees and costs;

G.    Award Mr. Nicoletti pre- and post-judgment interest; and

H.    Award Mr. Nicoletti all further relief the Court finds just and proper.

## **JURY TRIAL DEMAND**

Mr. Nicoletti demands a trial by jury on all issues so triable.

Dated: July 22, 2021

Respectfully submitted,

/s/ Amir R. Tahmassebi
Amir R. Tahmassebi
Konicek & Dillon, P.C.
21 W. State Street
Geneva, Illinois 60134
Tel: (630) 262 – 9655
Fax: (630) 262 - 9659
amir@konicekdillonlaw.com

Gregory P. Brown
Florida Bar No. 98760
Ryan J. Leuthauser
Florida Bar No. 99517
Ryan M. Guerin
Florida Bar No. 1011326
HILL WARD HENDERSON, P.A.
101 East Kennedy Boulevard
Suite 3700
Tampa, Florida 33602
Tel: (813) 221-3900; Fax: (813) 221-2900
gregory.brown@hwhlaw.com
ann-marie.hallett@hwhlaw.com
ryan.leuthauser@hwhlaw.com

debra.whitworth@hwhlaw.com
ryan.guerin@hwhlaw.com
erika.vap@hwhlaw.com

*Attorneys for Mr. Nicoletti*